NEW CHESTER WATER CO. et al. v. HOLLY MANUF'G CO. et al.

(Circuit Court of Appeals, Third Circuit. November 14, 1892.)

No. 7.

1. FEDERAL COURTS—JURISDICTION—CITIZENSHIP—PARTIES.

A firm owning substantially all the stock of a water company purchased engines for the same, and subsequently suffered judgment by confession for a balance due thereon. In the mean time they sold and transferred all the stock to others, and conveyed the land on which the engines were located to the water company. A suit was subsequently brought by the seller of the engines to assert a vendor's lien thereon, and by an amendment the members of the firm were made parties plaintiff. *Held* that, as no relief was sought against them, and as they had parted with all their interest, they were merely formal parties, and it was not necessary to make them parties defendant, and the fact that they were citizens of the same state with complainants did not oust the jurisdiction. 48 Fed. Rep. 879, affirmed.

2. EQUITY—PARTIES—JURISDICTION OF FEDERAL COURTS.

In a suit to assert a vendor's lien against specific machinery of a corporation it is not necessary to make the trustee of its mortgage bondholders a party defendant, when substantially all the bondholders themselves are before the court. The trustee being without the territorial jurisdiction of the court, its presence can be dispensed with under equity rule 47, even though it might otherwise be deemed a proper or necessary party. 48 Fed. Rep. 879, affirmed.

3. VENDOR'S LIEN—NOTICE—CORPORATIONS.

A firm which owned all the stock of a water company, and whose employés were its officers, purchased pumping engines, contracting that the same should be subject to a lien for the price, and placed them in the company's works. After erection, the engines remained in the exclusive charge and management of the seller's agent. Meanwhile the firm disposed of all

its stock, and conveyed to the water company the land on which the engines stood. *Held*, that the company had notice of the lien, and took subject thereto. 48 Fed. Rep. 879, affirmed.

4. SAME—VALIDITY—PUBLIC POLICY.
There is no public policy which renders invalid a contractual vendor's lien upon the pumping engines of a water company.

5. FIXTURES—SALE—INTENT OF PARTIES.
On a sale of pumping engines for waterworks the purchaser expressly agreed that the seller should have a lien thereon, with full right of possession, until the price was paid. *Held*, that this showed an intent that they should not become a part of the realty, and, under the Pennsylvania decisions, this intent was controlling, and the lien was not waived in favor of the mortgage bondholders or other creditors by attaching the engines to the foundation in the usual manner.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

In Equity. Bill to establish and enforce a lien on certain pumping engines for the purchase price thereof. Decree for complainants. 48 Fed. Rep. 879. Defendants appeal. Affirmed.

Statement by WALES, District Judge:

This was a suit in equity, brought in the United States circuit court for the eastern district of Pennsylvania by the Holly Manufacturing Company, a corporation organized under the laws of the state of New York, and a citizen of that state, against the New Chester Water Company and the South Chester Water Company, corporations organized under the laws of the state of Pennsylvania, and citizens of said state; William G. Hopper and Harry S. Hopper, citizens of the state of Pennsylvania, trading under the name of William G. Hopper & Co.; William Bucknell, a citizen of the state of Pennsylvania; Richard Wood, George Wood, Walter Wood, and Stuart Wood, citizens of the state of Pennsylvania, trading under the firm name of R. D. Wood & Co.; and the Bienville Water Supply Company, a corporation existing under the laws of the state of Alabama, and a citizen thereof.

The bill, as originally filed, alleges that on March 21, 1887, the New Chester Water Company made a contract with Samuel R. Bullock and William S. Mercer, citizens of the state of New York, doing business under the name of Samuel R. Bullock & Co., by which Bullock & Co. agreed to construct and equip, at their own proper cost and expense, a system of waterworks at or near Chester, Pa., in the manner and according to the plans and specifications prepared by the chief engineer of the water company; the said works to be completed and ready for occupation on or before the 1st day of January, 1888. Bullock & Co. also agreed to furnish at their own expense all lands necessary for the location of engine and boiler house and reservoir site. On the completion of the works the water company was to cause an inspection and test of the same, to satisfy it that the said works were constructed and equipped in accordance with the terms of the contract. Bullock & Co. covenanted to transfer and deliver the said waterworks and other property to the New Chester Water Company free from and unincumbered by any liens for the benefit of laborers, mechanics, or material men. In consideration of the execution and performance of the contract by Bullock & Co., the water company was to pay that firm $500,000 in first mortgage 6 per cent. bonds of the water company, secured by a first mortgage on all the property and franchises of the water company, as authorized by resolutions of its stockholders and board of directors, and 17,000 shares of its common capital stock at a par value of $50 each. The bonds and stock were all delivered to Bullock & Co. to enable them to proceed with and to procure the construction and completion of the water supply system, and to be used for that purpose, and to the payment of the said Bullock & Co. therefor when completed. That, for the purpose of carrying out their contract with the water company, Bullock & Co., on August 3, 1887, made a contract with the Holly Manufacturing Company to set up in working order at the pumping station in Chester, Pa., two pumping engines, for which Bullock & Co. were to pay to the Holly Manufacturing Company the sum of $50,-000 in six specified installments until the whole amount of the purchase money of the said engines and connections should be fully paid to the Holly Manufacturing Company. That the Holly Manufacturing Company constructed and erected

the engines in accordance with the contract, and received from Bullock & Co. $8,333.33 on account; and there remains due and owing to the complainant the sum of $41,667, with interest from August 11, 1888. That Bullock & Co., after making the contract of August 3, 1887, with the Holly Manufacturing Company, for the purpose of raising money to carry on the construction of the water works, pledged the bonds and shares of the water company to William G. Hopper & Co. to secure the price of materials and money to be supplied for the completion of the said waterworks.

The bill averred, in substance, the facts above stated, and prayed a decree establishing a lien in favor of the Holly Manufacturing Company, free and superior to any and all liens and claims of any other parties upon the said pumping engines; and, further, that the defendants in this cause may be decreed to pay to the Holly Manufacturing Company the amount ascertained to be due for said pumps at a short day; and that, in default thereof, the defendants be absolutely foreclosed of all right in equity of redemption in the same.

To the bill as originally filed the defendants demurred upon the ground of the nonjoinder as parties in the cause of Samuel R. Bullock and William S. Mercer, trading as Samuel R. Bullock & Co., whereupon the said Samuel R. Bullock & Co. were brought upon the record by an amendment which set forth they joined as parties plaintiff, "not as seeking any special or distinct relief in the premises in this proceeding, but in affirmance of the rights of their coplaintiff, the Holly Manufacturing Company, and in order to invest the court with full jurisdiction in the premises, so that a complete decree, protecting the rights of all parties, can be made." Thereupon the defendants answered, inter alia, suggesting that the principal controversy in the cause was between the complainant the Holly Manufacturing Company and Bullock & Co., all of whom were citizens of the state of New York, and that, therefore, the court was without jurisdiction in the premises.

At the hearing upon the bill, answer, and proofs, the following facts appeared:

In the year 1885 charters of incorporation were obtained for four water companies, namely, the New Chester Water Company, the South Chester Water Company, the Penn Water Company, and the Upland Water Company, formed for the purpose of furnishing water for public and domestic use to the city of Chester and adjacent boroughs in Delaware county, Pa. On December 9, 1886, before any work was done by them, a written agreement was entered into between the four named companies in their corporate capacity, all the stockholders thereof individually, and Samuel R. Bullock & Co., a firm of waterworks contractors. The leading purpose of the parties to this agreement is expressed in the following clause of the preamble:

"And whereas, the stockholders are desirous of selling their said shares of capital stock, and of transferring and surrendering the absolute control of the water companies, and the vendees (Bullock & Company) are desirous of purchasing and acquiring the same, accordingly the stockholders thereby agreed to transfer all the stock of said companies to Samuel R. Bullock & Company, and to deliver to them all the charters, certificates of organization, books, papers, deeds, maps, plans, estimates, stock certificate books, transfer books, minute books, receipts, accounts, contracts, the corporate seals, and all other property of any and every description, kind, or nature belonging to the water companies, or any of them; and, in consideration thereof, Bullock & Company agreed to enter into a contract with the water companies, on terms to be arranged, for the construction and equipment of a system of waterworks for furnishing water to the places which the companies were authorized to supply."

The stockholders having complied with their part of this agreement, the following transactions took place and contracts were entered into, all on March 21, 1887: Resolutions were adopted by the stockholders of the Penn Water Company and Upland Water Company to sell and convey the franchises and property of those companies to the South Chester Water Company, and such written transfers were executed. Resolutions were adopted by the stockholders of the South Chester Water Company to increase its capital stock from $1,000 to $600,000, and to issue its bonds for $300,000, to be secured by a mortgage upon its franchises and property. Resolutions were adopted by the stockholders of the New Chester Company to increase its capital stock from $500,000 to $1,000,000, to issue its bonds for $500,000, to be secured by a mortgage upon its franchises and property, and that the company guaranty the said bonds of the South Chester Water Company. The New Chester Water Company and the South Chester Water Company entered into an agreement which, inter alia, provided that the former company, by

its machinery, and from its reservoirs, would supply water through the pipes of the latter company to its territory. And, finally, a contract in writing was entered into between Samuel R. Bullock & Co. and the New Chester Water Company, whereby the former agreed to provide the necessary land for an engine and boiler house and a reservoir site, and to furnish all material and labor for and to construct and equip waterworks at Chester, to be accepted by the water company after completion and satisfactory inspection and test, for the consideration to the contractors of $500,000 in the mortgage bonds of the water company and 17,000 shares of its capital stock of the par value of $50 each. At that date, March 21, 1887, the stockholders of the New Chester Water Company and the number of their respective shares were as follows: Samuel R. Bullock & Co., 9,995 shares; J. L. Forwood, 1 share; W. H. Miller, 1 share; E. F. Fuller, 1 share; Ellis Morrison, 1 share; Charles M. Berrian, 1 share. Each of the last-named five persons then held one share of stock in each of the other named water companies, Bullock & Co. holding the rest of the stock thereof. The proofs fully warrant the conclusion that these holdings of stock by Forwood, Miller, Fuller, Morrison, and Berrian were nominal and formal, merely to give a legal status to the organization. These five persons constituted the board of directors of the New Chester Water Company, Forwood being president, and Miller secretary. Fuller was chief engineer of the company, and an employe of Bullock & Co. Berrian was the attorney of the company, and private counsel of Mr. Bullock. All these five directors were completely under the control and direction of Samuel R. Bullock & Co. Emil Woltman, the treasurer of the company, was the confidential clerk of that firm. Samuel R. Bullock testified: "An arrangement was perfected, whereby the personnel of the New Chester Water Company was subordinated to the management, direction, and control of my firm, based upon the idea that we would carry out the objects for which that company was incorporated." At the dates of several transactions to which reference is about to be made, and from March 21, 1887, continuously down until November, 1888, Samuel R. Bullock & Co. had "the absolute control" of the New Chester Water Company, and the organization of that company was wholly under the management and practically in the hands of that firm. The directors acquiesced in whatever that firm did, and practically were but its agents.

On April 1, 1887, the New Chester Water Company executed a mortgage of its franchises and property, then owned or thereafter to be acquired, to the Farmers' Loan & Trust Company, a corporation of the state of New York, to secure payment of $500,000 of its bonds, payable to Samuel R. Bullock & Co. or bearer, and the South Chester Water Company executed a like mortgage to the same trustee, to secure-like bonds to the amount of $300,000. On May 31, 1887, an agreement in writing was entered into between the South Ward Waterworks, a corporation, the city of Chester, and the New Chester Water Company, whereby, for a consideration mentioned, and moving from the last-named company, the first-named corporation agreed to sell, transfer, and convey all its property, real and personal, to the New Chester Water Company. On June 13, 1887, a contract in writing was made between William G. Hopper & Co. and Samuel R. Bullock & Co., whereby, for a specified consideration, the formed agreed to furnish to the latter advances of money upon the bonds of the New Chester Water Company, as earned by and delivered to Bullock & Co., and the notes of that firm, with a deposit as further collateral security of all the stock of the New Chester Water Company and the property of the South Ward Waterworks. On July 7, 1887, Hopper & Co. made a special advance of about $300,000 to Bullock & Co., to enable them to consummate the purchase of the South Ward Waterworks, and as security therefor Bullock & Co. delivered to Hopper & Co. the above-mentioned $300,000 of bonds of the South Chester Water Company. In pursuance of a written authority signed "J. L. Forwood, President," and "W. H. Miller, Secretary," the real estate of the South Ward Waterworks, by the deed of that corporation, dated and executed July 7, 1887, was conveyed to Samuel R. Bullock in fee. On July 12, 1887, Samuel R. Bullock, by deed of that date, conveyed the said real estate to H. S. Hopper, who, on July 29, 1887, executed and gave to Bullock an instrument in writing setting forth that the conveyance to him was made as security for advances made and to be made by Hopper & Co. to Bullock & Co. All the advances which Hopper & Co. ever made under their contract of June 13, 1887, were made prior to September, 1887. On August 3, 1887, Samuel R. Bullock & Co. and the Holly Manufacturing Company, a corporation of the state of New York, entered into a written contract, whereby the latter agreed to manufacture two pumping engines of specified capacity, and set up the same at the city of Chester, for the

sum of $50,000; payable $8,333.33 on each engine when delivered in Chester, and the like sum on each engine when it has been properly run 30 days, and the like sum on each engine 30 days thereafter.  The contract contains the following clause:

"When said engines and connections are completed and ready for service, and on notice thereof to the party of the first part (Bullock & Co.) to that effect, the same shall be subjected to a fair trial of their capacity and efficiency for not exceeding twenty-four hours, and on the successful testing thereof the liability of the party of the second part (Holly Company) hereunder shall cease and determine, but it is expressly understood and agreed that the party of the second part shall have a lien on all of said engines and connections, and the party of the second part may remain in and have full possession thereof until the whole amount of the purchase price of said engines and connections shall have been fully paid to the party of the second part or its assignee."

One payment only, namely, the sum of $8,333.33, was made to the Holly Company under its contract, and at the date of the bringing of this suit the balance, or sum of $41,667, was due that company on said engines.

On October 26, 1887, a tripartite agreement was entered into between Samuel R. Bullock & Co., R. D. Wood & Co., and William G. Hopper & Co., whereby, after reciting contracts between Bullock & Co. and Hopper & Co. for advances by the latter to the former upon a pledge of bonds and stocks of water companies, and assignments by Bullock & Co. to Wood & Co. of the bonds and stock so pledged as collateral security for materials that they had furnished, and contracts between Bullock & Co. and Wood & Co., by which the latter had undertaken to complete waterworks at Chester, Greencastle, and Mobile, and the representation by Bullock & Co. that $200,000 would enable them to complete those works, William G. Hopper & Co. agreed to advance to Bullock & Co. $200,000, the same to be applied by Wood & Co. to the completion of the waterworks at the three named places in certain specified proportions, Wood & Co. to present to Hopper & Co. the detailed applications by Bullock & Co. for money as needed, and Hopper & Co. thereupon to furnish such amounts (within the limit stated) to Wood & Co., who should give their checks for the same to Bullock & Co., who should disburse the moneys for the purposes aforesaid: and, in consideration of this advance by Hopper & Co., Wood & Co. agreed to procure the completion of the waterworks at the three named places, "clear of all liens ahead of the securities held by William G. Hopper & Co." Under this agreement Hopper & Co. advanced the $200,000, which was all applied to the waterworks at the three named places, but not in the proportions mentioned in the contract.  The specified amount applicable to the works at Chester was $129,800, whereas the sum actually applied was $61,000 only.  But the representation by Bullock & Co. that $200,-000 would suffice to complete the works at the three places proved to be incorrect, for, besides the money so advanced by Hopper & Co., Wood & Co., in the completion of these works, used $105,000 of their own money, and even then the balance of $41,667 due the Holly Company on the pumping engines at Chester was left unpaid, and also $25,000 due that company on engines at Mobile.    All the advances by Hopper & Co. under the tripartite agreement were made before the latter part of January, 1888, except a trifling sum, which was paid shortly afterwards.

In October, 1887, the Holly Company shipped one of the pumping engines to Chester, and in February, 1888, the other.   Each was consigned to that company itself, and its agents at Chester received the engines, and proceeded, at its expense, to put them in place.  They were set on the top of masonry foundations, and were attached thereto by a number of two inch iron bolts.  They could not be operated or tested otherwise.  The engines stand in a brick building erected on land which the South Ward Waterworks Company agreed to sell and convey to the New Chester Water Company, but actually conveyed to Samuel R. Bullock, who conveyed the same to H. S. Hopper for the purpose set forth in the paper executed by the latter, as already mentioned.  Each engine weighs from about 70 to 80 tons, but they can easily be disconnected from the foundations on which they rest without disturbing the foundations, and can readily be taken apart and through the door of the engine house without injury to the building.  When the first engine was shipped to Chester, John Lockman, by order of the Holly Company, and as its agent, went there to superintend the erection of the engines, and to take charge and control thereof.  This he did, remaining constantly in charge. The work of setting them up and ready for service was not completed until some time in July, 1888, but for the delay the Holly Company was not responsible.

From the time the first engine was got in working order Lockman acted as engineer, and he has maintained the exclusive charge and custody of both engines. He has carried a key to the building. His wages have all been paid by the Holly Company, and he has acted throughout as its agent. No formal test of the pumping capacity of the engines, as provided by the contract, was ever made; nor was there any formal acceptance of them by any one. When ready, they were set to work pumping water into the reservoir, and have continued to do so under Lockman's control. It is shown that explicit instruction was given by the Holly Company to Lockman to hold possession of the engines for that company, but the exact date thereof does not appear. Lockman states that it was given about midsummer, 1888. Samuel R. Bullock, referring to conversations he had with the officers or representatives of the Holly Company, testified thus: "They told me that they proposed to have Lockman remain there as their representative in charge of the pumps, but they didn't want to interfere with the operations of the company, so he could act as engineer and run the pumps right along;" and Mr. Bullock further testified that he consented to Lockman's remaining in possession and charge, as desired by the Holly Company. The bill in this case was filed September 19, 1888, while Lockman was still in control of the pumping engines, In November, 1888, Bullock & Co. assigned their entire remaining interest in the bonds and stock of the New Chester Water Company to Wood & Co., and at the same time delivered to them resignations of the officers of the water company. Thereupon new officers were elected, and the water company then took the actual possession of the works, but Lockman's control of the engines continued.

Hopper & Co. and Wood & Co. together hold substantially the entire mortgage bond issue of $500,000 of the New Chester Water Company; 16 bonds of $1,000 each are held by Dyer & Black, under a pledge made in July, 1887, but only to indemnify them against a claim which the water company itself may have against them as sureties for Bullock & Co., touching a lien of $15,000 which they were to remove. All the bonds and stock of the New Chester Water Company which Bullock & Co. were to receive under their construction contract had been delivered to them probably before the first pumping engine reached Chester, and certainly before its erection began. On March 31, 1890, Samuel R. Bullock and wife executed and delivered to the New Chester Water Company a deed of conveyance of the land upon which the engine house and pumping engines stand.

Upon this finding of facts by the court, a decree was entered on the 12th of October, 1891, dismissing the bill as to R. D. Wood & Co. so far as it sought to establish an individual liability against that firm, and sustaining the lien of the Holly Manufacturing Company upon the pumping engines; fixing the balance of the purchase money due upon the said engines and remaining unpaid at the sum of $41,667, with interest thereon from the 11th day of August, 1888; and further ordering that, unless the defendants, or some of them, shall, on or before the 23d day of November next, pay to the plaintiffs the amounts found due them, then the said engines and their appliances, etc., to be sold at public sale on at least three weeks' notice, etc.; whereupon the defendants the New Chester Water Company and D. R. Wood & Co. prayed an appeal to this court, and through their counsel have filed the following assignments of error:

First. The learned court erred in holding that "upon the whole case, then, we are of the opinion that the contractual lien of the Holly Manufacturing Company upon the pumping engines here in question is valid and binding, and is enforceable in this suit."

Second. The learned court erred in holding that Samuel R. Bullock and William S. Mercer, trading as Samuel R. Bullock & Co., were not necessary parties defendant to the cause.

Third. The learned court erred in holding: "So far as the bill seeks to enforce the Holly Company's lien, it is manifest that there is no dispute between the company and Bullock & Co. Samuel R. Bullock, indeed, was one of the principal witnesses in the case on behalf of the Holly Company to establish its lien, and hence a decree in its favor would conclude him and his firm, if there was any open question on that subject affecting them. But there is no such open question. The Holly Company is not seeking any relief, and needs no decree against Bullock & Co. It is urged, indeed, that that company is proceeding as for a foreclosure without making its debtor, who is the owner of the property, a party defendant; but this is a mistaken view. The ownership of the engines is not in Bullock & Co., and, in truth, was never intended to be in them, for in the purchase they acted in the interest and behalf of the New Chester Water Company. But there can be no longer any pretense of ownership in Bullock & Co., for Sam-

uel R. Bullock, by his deed, has conveyed the title to the real estate to the water company. It is laid down in *Jones on Mortgages* (volume 2, § 1404) that in an equitable suit for foreclosure the mortgagor, after he has conveyed the whole of the premises mortgaged, is not a necessary party to the suit. Moreover, Bullock & Co. have assigned all their interest in the bonds and stock of the water company to Wood & Co.; therefore they have no longer any interest, near or remote, in this particular controversy. They are altogether formal parties, whose presence does not oust the jurisdiction of the court, coming within the rule laid down in *Wormley v. Wormley*, 8 Wheat. 451, where the applied test was whether a decree was sought against the party. Here the Holly Company seeks to enforce a charge in rem, and Bullock & Co. have neither title to nor interest in the thing."

Fourth. The learned court erred in holding that the Farmers' Loan & Trust Company was not a necessary party defendant to the cause.

Fifth. The learned court erred in saying to the objection that the Farmers' Loan & Trust Company is not joined as a defendant in this suit: "It is sufficient to say that, as substantially the whole body of bondholders is before the court, the presence of their trustee is wholly unnecessary. Moreover, the enforcement of the Holly Company's specific lien does not involve the validity of the trust mortgage, nor affect its standing as respects the principal mortgaged thing, the controversy relating to a mere incidental matter. Again, as the joinder of the trust company might oust the jurisdiction of the court, the omission to make it a party defendant is fully warranted by equity rule 47."

Sixth. The learned court erred in holding: "But, in truth, with respect to this transaction, the distinction between Bullock & Co. and the water company is purely formal and fictitious. Bullock & Co. were the water company in everything but name. They really held the entire capital stock. Now, no court has ever yet decided that an incorporated company in this artificial capacity can be deemed to be ignorant of a matter affecting the company which is known to every individual stockholder. In our judgment, to treat the water company as a bona fide purchaser or possessor of the engines without notice of the contractual lien of the Holly Company would be unreasonable and unjust. The water company cannot honestly retain the engines without paying the balance of the purchase price."

Seventh. The learned court erred in holding that the contractual lien of the Holly Manufacturing Company was effective after the pumping engines had been delivered and put into operation upon the property of another.

Eighth. The learned court erred in holding that the lien of the mortgage made by the New Chester Water Company to the Farmers' Loan & Trust Company of New York, dated April 1, 1887, did not attach to the pumping engines when they were placed upon the mortgaged premises.

Ninth. The learned court erred in directing a sale of the pumping engines upon which complainant asserted a lien without the prior entry of a decree in personam against Samuel R. Bullock & Co., who, by the undisputed evidence in the cause, were primarily liable to the Holly Manufacturing Company for the debt, to secure payment of which the sale is ordered.

Richard C. Dale and Samuel Dickson, for R. D. Wood & Co., appellants.

William Ward, for the New Chester Water Co., appellant.

Rowland Evans, R. L. Ashhurst, and L. F. & G. W. Bowen, for appellees.

Before DALLAS, Circuit Judge, and WALES and GREEN, District Judges.

WALES, District Judge, (after stating the facts.)

ON THE QUESTION OF JURISDICTION.

If Bullock & Co. had been made parties defendant, as suggested by the demurrer to the bill, the jurisdiction of the circuit court would have been ousted, because the individual members of that firm were

citizens of the same state with the Holly Company. But, as there was no subject or matter of controversy existing between the Holly Company and Bullock & Co., there was no necessity for making the firm defendants, and they were therefore made coplaintiffs only for the purpose, as stated in the amendment to the bill, of investing "the court with full jurisdiction of the premises, so that a complete decree protecting the rights of all parties can be made." The firm had divested themselves of all interest in the bonds and stock of the water companies by their assignments to Wood & Co. and to Perrott, and on March 30, 1890, Samuel R. Bullock and wife had conveyed to the New Chester Water Company the land upon which the engine house and pumping engine stand. In addition to this, the amount due by Bullock & Co. to the Holly Company had been reduced to a judgment by confession, so that there was no dispute about the indebtedness of the firm to their coplaintiff. Under these circumstances, it is evident that Bullock & Co. are no more than nominal parties. No relief is sought against them, the object of the bill being to enforce the complainants' lien in rem; and the rule is well settled that the assignor of a mortgage, who has parted with his interest in the mortgaged premises, is not a necessary party to a foreclosure bill. 2 Jones, Mortg. § 1404. Under the rule laid down in Wormley v. Wormley, 8 Wheat. 451, it would seem that Bullock & Co. might have been joined as defendants without depriving the court below of jurisdiction. In that case Wormley was made one of the defendants to the suit, and his wife and minor children were plaintiffs, so that all the parties on each side of the cause were not citizens of different states; but the court held that Wormley was but a nominal defendant, joined for the sake of conformity in the bill, against whom no decree was sought. He voluntarily appeared, though perhaps he could not have been compelled so to do, and the court would not suffer its jurisdiction to be ousted by the mere joinder or nonjoinder of formal parties, but rather proceed without them, and decide upon the merits of the case between the parties who had the real interests before it, whenever it could be done without prejudice to the rights of others. In Kerr v. Watts, 6 Wheat. 559, the court, in describing the necessary parties in equity, said: "No one need be made a party complainant in whom there exists no interest, and no one a party defendant from whom nothing is demanded." The pumping engines had never been delivered to or accepted by Bullock & Co., and no ownership had been vested in, claimed, or exercised by that firm. The engines were intended to be, when paid for, the property of the New Chester Water Company.

The objection that the Farmers' Loan & Trust Company was not joined as a defendant is perhaps still less tenable. That company was the trustee of the bondholders, but, as substantially all of the latter were before the court, the appearance of their trustee was not necessary. The enforcement of the complainants' lien on the engines will not affect the validity of the trust mortgage which attaches to the land, and not necessarily to the personal property which may be found thereon. But, if there was any doubt as to the necessity of making the trust company a party defendant, it would be removed by the application of equity rule 47, which provides that "in all cases

where it shall appear to the court that persons who might otherwise be deemed necessary or proper parties to the suit cannot be made parties by reason of their being out of the jurisdiction of the court, or incapable otherwise of being made parties, or because their joinder would oust the jurisdiction of the court as to the parties before the court, the court may, in their discretion, proceed in the cause without making such persons parties; and in such cases the decree shall be without prejudice to the rights of absent parties." This rule is declaratory of the previous decisions of the supreme court on the subject. The general rule as to parties in chancery is that persons falling within the definition of "necessary parties" must be brought in for the purpose of putting an end to the whole controversy, or the bill will be dismissed; but in the federal courts this rule has been relaxed, resulting from two causes: First, the limitation imposed upon the jurisdiction of these courts by the citizenship of the parties; and, secondly, their inability to bring in parties, out of their jurisdiction, by publication. Notwithstanding this rule, a circuit court can make no decree affecting the rights of an absent person, and all persons whose interests would be directly affected by the decree are indispensable parties. Chadbourne v. Coe, 51 Fed. Rep. 481. But the Farmers' Loan & Trust Company does not belong to this category.

## ON THE QUESTION OF LIEN.

The counsel for the appellants rely on their ignorance of the contract between the Holly Company and Bullock & Co. by which a lien on the engines was reserved. The evidence shows that, to whatever extent the other parties defendant may have been ignorant of the lien, the New Chester Water Company must have had knowledge of the contents of the contract of August 3, 1887, for, prior to that date this company had become virtually identical with Bullock & Co., and was subject to the control and management of that firm for all practical purposes. The officers and directors of the water company were the agents and servants of Bullock & Co., and some of the directors had personal knowledge of the terms of the contract. From the time when the engines were delivered at Chester, consigned to the Holly Company, they remained in the exclusive possession of that company, through its agent, John Lockman, whose wages were paid by the company, and who was instructed to retain possession of the property. These facts were open to the observation, and must have come to the knowledge, of the water company. The precise date when Hopper & Co. and R. D. Wood & Co. first acquired knowledge of the lien is a matter of dispute, but it sufficiently appears that they had intimate business relations with Bullock & Co. in reference to the loans of large sums of money to be applied to the construction of the waterworks at Chester; and the tripartite agreement of October 26, 1887, between the three firms, provided that these waterworks should be completed clear of all liens prior to the securities held by Hopper & Co. Samuel R. Bullock testified that he gave to Hopper & Co. and to R. D. Wood & Co. typewritten copies of the contract of August 3, 1887, of which the latter say they have no recollection, but the probabilities are strongly in favor of the truth of Bullock's statement. Apart from

this, there is nothing in the history of these transactions from which it can be inferred that either Hopper & Co. or Wood & Co. advanced money or gave credit to Bullock & Co. on the faith of the engines, or under the belief that they would constitute a part of the real property of the water company.

But it is contended that it would be against the policy of the law to enforce the lien against an integral part of the property of a public corporation, and in support of this proposition reference is made to the case of Foster v. Fowler, 60 Pa. St. 27, in which the court decided that the buildings, etc., of such a corporation, necessary for carrying on its operations, are not subject to a mechanic's lien. In that case the plaintiff attempted to enforce a statutory mechanic's lien, which, if effectual at all, covered not only the machinery and building containing it, but also the entire premises on which they stood. Here the Holly Company claims a contractual lien on a specific piece of property, which, in fact, had not been delivered to or accepted by the water company before the filing of the bill, September 19, 1888, and which up to that time had not become a part of the real estate. The Holly Company had not parted with its possession of the engines which had been placed on foundations for trial, to test their capacity and efficiency, and, had they proved to be defective, would have been removed and thrown back on the vendor's hands. By attaching the engines to the foundations the Holly Company did not intend to waive their lien, which they continued to maintain by actual possession of the property. The sale to Bullock & Co. was not an absolute one, the lien was not a secret one, and up to the filing of the bill possession in fact of the property had not passed to the water company.

It is conceded that the validity of the lien depends on the laws of Pennsylvania, and an examination of the judicial decisions of that state will put at rest any doubt that may be entertained on this subject. These decisions hold that the intention of the parties to the contract is the main thing to be considered in deciding whether they meant to give the vendor a lien on the property sold. Thus, in Shell v. Haywood, 16 Pa. St. 523, where manufacturers had fixed parts of machinery in a building attached to a mill, the owner of the latter, becoming embarrassed, agreed that the boilers and the machinery attached or to be attached to them were the property of the manufacturers, who were to be left to their legal remedy for the materials already furnished, or to the removal of the same at their option; and the court held that, as the parties had agreed that the property sold to the mill owner should be considered as personal property, it was immaterial whether or not, or in what manner, it was attached to the realty. In Hill v. Sewald, 53 Pa. St. 271, the court said that it was not the physical character of the connection with the realty which constitutes the criterion of annexation, but the intention to annex, whether rightfully or wrongfully, is the true legal criterion. In Vail v. Weaver, 132 Pa. St. 363, 19 Atl. Rep. 138, it was decided that the engine, machinery, and appliances of an electric light plant do not pass, with the real estate upon which it is operated, to the purchaser of the realty, at a sale under a mortgage judgment, unless it was the intention to make the plant a part of the realty when it

was erected. If, therefore, under the law of Pennsylvania, as declared by its highest judicial tribunal, the intention of the contracting parties is the standard by which the character of boilers, engines, and their appliances which may be placed upon the premises of another, is to be judged, it will not be necessary in the present case to pursue the inquiry as to whether or not a mortgage of the premises will cover after-acquired property; for we have only to discover what was the intention of the parties to the contract of August 3, 1887, to ascertain whether the pumping engines manufactured by the Holly Company were to be considered as personalty or realty. In Vail v. Weaver, supra, the court emphasized its conclusion by saying, "No matter what the law formerly may have been," mere physical attachment with the realty is no longer a criterion of annexation, but the latter depends on the intention of the parties; citing Hill v. Sewald, supra; Seeger v. Pettit, 77 Pa. St. 437; Morris's Appeal, 88 Pa. St. 368.

It is admitted by counsel for the appellants that, while the engines remained detached and separable from the real estate, the Holly Company was entitled to its lien, but it is claimed that when they were incorporated into the real estate the rights of the defendants, as mortgage creditors and bondholders, attached, and the lien was lost. If, however, this question is to be determined by the law of Pennsylvania, as announced in the cases just cited, then the intention of the parties to the contract of August 3, 1887, must prevail. What the intention was is to be gathered from the terms of the contract, and the parties to it could not have used plainer language than they did to express their understanding of the conditions on which the engines were to be made and placed in position, namely: "It is expressly understood and agreed that the party of the second part (the Holly Company) shall have a lien on all of said engines and connections, and the party of the second part may remain in and have full possession thereof until the whole amount of the purchase price of said engines and connections shall have been fully paid to the party of the second part or its assigns." The parties did not intend an absolute sale of the property. The sale was not to be perfected until the property had been paid for, and to secure the payment of the price the vendor was to retain possession until this condition had been complied with. Retention of possession under such circumstances is inconsistent with an absolute sale. Hineman v. Matthews, 138 Pa. St. 204, 20 Atl. Rep. 843. The words used by the contracting parties must be taken in their ordinary sense, and there is no rule of construction which admits of any other meaning being given to them than that the sale was made subject to the payment of the price agreed on; and this interpretation is confirmed by the action of the Holly Company in holding on to the possession of the engines, and by the proof that there had been no delivery of the property to Bullock & Co. or to the water company, or of acceptance by either of the latter.

As to the general rule of law, uncontrolled by local statutes, governing conditional sales, the opinion of the supreme court of the United States, in Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. Rep.

51, contains an elaborate discussion of the whole subject, with a full review of the adjudged cases both in England and in the courts of our own country; and the decision of the court was that, both on principle and authority, a conditional sale of personal property, even where it has been accompanied by delivery, is valid both as against the parties and third persons; and the court stated the general rule, as established by overwhelming authority, to be "that, in the absence of fraud, a conditional sale is good and valid as well against third persons as against the parties to the transaction."

The present case does not fall within the class of cases cited by appellants' counsel, in which it has been held that the rails and bridges of a railroad, of necessity, become a permanent part of the whole structure, and therefore cannot be made the subjects of special liens, but is more analogous to the class in which the rolling stock of a railroad company has been held to be the subject of a conditional sale, and on which a lien may be reserved by the vendor. And this appears to be reasonable. Locomotive engines and cars are as essential to the operation of a railroad as pumping engines are to waterworks, but it has been held that the former may be treated as personal property, and as such may be liable to a lien in favor of the seller, which will not be lost in consequence of a prior mortgage which, by its terms, was made to cover after-acquired property. U. S. v. New Orleans & O. R. Co., 12 Wall. 362. See, also, Gregory v. Morris, 96 U. S. 619; Harlan v. Harlan, 20 Pa. St. 303; Benedict v. Marsh, 127 Pa. St. 309, 18 Atl. Rep. 26; Haak v. Linderman, 64 Pa. St. 499; Krause v. Com., 93 Pa. St. 421; Peek v. Heim, 127 Pa. St. 500, 17 Atl. Rep. 984; Summerson v. Hicks, 134 Pa. St. 566, 19 Atl. Rep. 808; Levan v. Wilten, 135 Pa. St. 61, 19 Atl. Rep. 945; Hineman v. Matthews, 138 Pa. St. 204, 20 Atl. Rep. 843.

As between the parties to the contract, there can be no question of the validity of the lien, or of the right of the Holly Company to enforce it against Bullock & Co.; and it must not be overlooked that Bullock & Co., at the date of the contract, were substantially the owners of the whole capital stock of the New Chester Water Company, and that Samuel R. Bullock held the legal title to the real estate on which the pumping engines were erected, and did not convey it to the water company until long after this suit had been instituted.

It has not been deemed necessary to consider the question of the invalidity of the bonds, issued by the water companies, on the ground that the companies had no power to issue these obligations because of the failure to comply with the requirements of the Pennsylvania statute which authorizes the issue of bonds by stock corporations to an amount proportioned to the value of their paid up shares. The facts found by the circuit court, and confirmed by an examination of the evidence, are sufficiently conclusive to establish the creation of the lien of the Holly Company, and to satisfy us that this lien was not lost or waived by any act of that company, and that no one of the appellants had acquired a superior equitable right to the property in dispute. The decree of the circuit court is therefore affirmed.